## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CC-00808-COA

CINDY PRITCHETT                                                                          APPELLANT

v.

MISSISSIPPI DEPARTMENT OF                                                            APPELLEE
EMPLOYMENT SECURITY

DATE OF JUDGMENT:             07/08/2022
TRIAL JUDGE:                  HON. KATHY KING JACKSON
COURT FROM WHICH APPEALED:    GEORGE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       CINDY PRITCHETT (PRO SE)
ATTORNEY FOR APPELLEE:        ALBERT B. WHITE
NATURE OF THE CASE:           CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                  AFFIRMED - 08/15/2023
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McCARTY AND SMITH, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     The Mississippi Department of Employment Security determined an employee had

voluntarily abandoned her job when she left the hotel where she worked without finishing

the duties assigned to her by her supervisor, and as a result, she was not entitled to

unemployment benefits. Finding that this decision was supported by substantial evidence,

we affirm.

## BACKGROUND

¶2.     Cindy Pritchett worked as a guest room attendant at the Harrah's casino in Biloxi. As

a GRA, her job was to clean rooms in the hotel. She had occupied that position for seven

years.

¶3.     Ms. Pritchett took about 15 to 25 minutes to clean each room.  GRAs are assigned a "board" of rooms, depending on how many need cleaning and how many people are on duty, and they are supposed to clean their board by the end of the day.  In previous years, GRAs were paid by each room on their board, but under a revised union contract, they were paid hourly.

¶4.     According to Ms. Pritchett's supervisor, as it neared the end of her shift, Ms. Pritchett was told "that she had two rooms left and she didn't want to do them or couldn't do them[.]" In the employer's version of events, when she and another supervisor asked Ms. Pritchett "why she couldn't do it[,] she just said she didn't want to do the rooms and she was leaving."

¶5.     Two supervisors then told Ms. Pritchett "that if she left without completing her board that would be job abandonment."  In response, the GRA told them "that because they no longer got paid . . . by room, and they went to hourly based off of their union agreements . . . she didn't have to work after five[.]"  She was again told she would be abandoning her job if she left, and Ms. Pritchett called her union representative.  After this phone call, she "clocked out, turned in her keys, and left her board and left property."

¶6.     Ms. Pritchett then went on a previously scheduled two-week vacation.  When she came back from her vacation, she was escorted off the premises and told not to return.  She sought unemployment benefits and initially began receiving them, but they were denied a few months later on the basis that she had voluntarily quit her job.  She appealed this decision, and a telephonic hearing was conducted before an administrative law judge.

¶7.     Ms. Pritchett had a different version of what happened than her employer.  She

2

pointed out that this occurred during the early days of the COVID-19 pandemic. She recalled when she went into work, she "wasn't feeling good." The GRA said, "My back was hurting, my body was aching, my head was hurting, everything was hurting." Nonetheless, she handled most of her board but was planning to leave at 5:00 p.m. In her memory, she told her employer she asked to "please get somebody to do the other two rooms because I'm not feeling well." Her reason for leaving was not that she was quitting; in her words, "I couldn't finish the rooms because I was sick."

¶8.     During the hearing with the ALJ, the employer disputed this version of events. The supervisor pointed out they were asking Ms. Pritchett to finish her board, which would have taken between 30 and 60 minutes for the two rooms. The supervisor was asked, "[H]ad she cleaned those two rooms . . . would she still have a job?" She responded, "Definitely," because "[s]he would have finished her board." The supervisor did not recall Ms. Pritchett saying she was sick; she only remembered the "reason she gave was because they were paid hourly, no longer per room."

¶9.     The ALJ ruled in favor of the employer, finding that Ms. Pritchett "voluntarily left her employment when she asked to leave work early without completing her assigned rooms," even though she was warned this would constitute abandoning her job. Further, the ALJ found that "[w]hen the claimant left her employment, continuing work was available and the claimant was at no threat of discharge." The ALJ also found Ms. Pritchett was "obligated to repay the assessed overpayment" of benefits she received before her denial "plus any interest that may accrue."

¶10. After the ALJ rendered this decision, Ms. Pritchett appealed to the MDES Board of Review, which adopted the ALJ's findings of fact and law and affirmed. Ms. Pritchett then appealed that denial to the George County Circuit Court, which likewise affirmed. She appealed from that decision, and the Supreme Court assigned the case to us for review.

## DISCUSSION

¶11. We employ a limited standard of review in cases from the MDES Board of Review, and its "finding that an employee has quit work voluntarily without good cause is a question of fact that will be upheld if it is supported by substantial evidence." *Mitchell v. Miss. Dep't of Emp. Sec.*, 348 So. 3d 1030, 1033 (¶7) (Miss. Ct. App. 2022).

¶12. State law declares that "[a]n individual shall be disqualified for benefits . . . for the week, or fraction thereof, which immediately follows the day on which he left work voluntarily without good cause, if so found by the department[.]" Miss. Code Ann. § 71-5-513(A)(1)(a) (Supp. 2019). "The burden of proof of good cause for leaving work shall be on the claimant, and the burden of proof of misconduct shall be on the employer." Miss. Code Ann. § 71-5-513(A)(1)(c).

¶13. As we summarized it in *Mitchell*, "[u]nemployment benefits are available for employees who leave work involuntarily, through no fault of their own." 348 So. 3d at 1033 (¶8). "An employee is disqualified from receiving unemployment benefits if he or she left work voluntarily and without good cause." *Id.*

¶14. In that decision, the worker told his employer "he would not be in because he was sick" and then alleged he sought medical care at a clinic. *Id.* However, we determined "[t]he

4

records from Urgent Care that [he] submitted are illegible," and "at no point did [his] testimony or other documentary evidence indicate that a physician had told [him] that he could not work." *Id*. at 1033-34 (¶9).

¶15. Despite his resistance to working, and "citing fears of COVID-19 if he rode with his co-workers in the truck to the job site," the employee refused compromises and alternatives suggested by his supervisor. *Id*. at 1034 (¶9). In lieu of his leaving, "his supervisor asked him to stay and work something out," but "[i]nstead of talking to his supervisor or suggesting another solution, [the worker] left." *Id*. He did not come back to work, and the company fired him. *Id*. MDES concluded he left work voluntarily. *Id*.

¶16. On appeal, we affirmed. *Id*. Citing a prior case, we held that "[t]he claimant did not exhaust all avenues with this employer in an effort to resolve this problem before he quit." *Id*.

¶17. On appeal, Ms. Pritchett filed a brief pro se. She argues that she "did not abandon [her] job" and offers that although she left work, she did not intend to abandon her job—as evinced by the fact that she indeed returned to work after her vacation. Furthermore, she argues that she left not out of disobedience but for "good cause," as she "was sick" with "symptoms of the Covid-19." However, Ms. Pritchett concedes in her filing that she did not seek medical care for the alleged symptoms. In response, MDES points to her supervisor's testimony that she never told her employer she was sick and, instead, just left after being told it would constitute abandonment.

¶18. So there is a split in the testimony between the employer and the claimant. In a case

seeking unemployment benefits, "[i]t is the role of the agency, in its expertise, to determine the weight of the evidence and the credibility of the witnesses." *Jackson Cnty. Bd. of Sup'rs v. Miss. Emp. Sec. Comm'n*, 129 So. 3d 178, 183 (¶15) (Miss. 2013). As to the witnesses and their testimony, their "credibility was a matter for the Board—not this court—to decide." *Franklin Collection Serv. Inc. v. Miss. Dep't of Emp. Sec.*, 181 So. 3d 304, 309 (¶20) (Miss. Ct. App. 2015) (finding that "where there is substantial evidence, an agency's fact finding must be allowed to stand even though there might be room for disagreement on that issue").

¶19. This case is similar to *Mitchell*. There is testimony that Ms. Pritchett simply determined of her own accord that she was finished working for the day and would leave and take her vacation. Ms. Pritchett's supervisors tried to talk her out of just leaving work and urged that if she just finished the two rooms on her board, then everything would be fine. Nonetheless, she left work. Based on this, MDES determined that she voluntarily quit. We find there is substantial evidence in the record to support that holding and will affirm on that basis.

¶20. In her pro se brief, Ms. Pritchett did not address the requirement by MDES that she repay the benefits she received in the time period after she was terminated, which amounted to $21,821. Under State law, "[a]n overpayment of benefits occurs when a person receives benefits . . . and is later found to be disqualified or ineligible for any reason, including, but not limited to, a redetermination or reversal by the department or the courts of a previous decision to award such person benefits." Miss. Code Ann. § 71-5-19(4)(a)(iii) (Supp. 2019). The claimant must then repay the overpayment subject to 1% interest "per month on the

6

unpaid balance until repaid[.]" Miss. Code Ann. § 71-5-19(4)(b).

¶21.    Ms. Pritchett was found to have abandoned her job on May 31, 2020, but she did not receive an adverse decision from the ALJ until October 26, 2021, only two days after a telephonic hearing was conducted. Although we are cognizant of the increased volume of disputed claims during COVID-19, this delay in reviewing her claim results in this extremely high assessment. Because the statute requires it, "[o]ur hands are largely tied here because discretion whether to require repayment belongs to MDES, not this [C]ourt," so we affirm. *Owens v. Miss. Dep't of Emp. Sec.*, 135 So. 3d 943, 945 (¶5) (Miss. Ct. App. 2014) (affirming repayment of $620).[1]

## CONCLUSION

¶22.    We find there was substantial evidence to support the decision that Ms. Pritchett left work voluntarily and without good cause and was therefore not entitled to unemployment benefits.

¶23.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, LAWRENCE AND SMITH, JJ., CONCUR.  WILSON, P.J., AND EMFINGER, J., CONCUR IN PART AND IN THE**

---

[1] We note that timely resolution or expedited review of disputed eligibility for benefits could alleviate the financial impact of decisions of this type. Other states have implemented waivers for repayment. *See* Ga. Code Ann. § 34-8-254 (allowing commissioner of labor to "waive the repayment of an overpayment of benefits if the Commissioner determines such repayment to be inequitable"); Ala. Code § 25-4-145(d)(2) (allowing the director of the unemployment program "to waive overpayments under such procedure and conditions as he or she may by regulation prescribe"); *Goodwin v. Dep't of Workforce Servs.*, 2023 Ark. App. 335, 2023 WL 3730406, at *3 (Ark. Ct. App. 2023) ("[R]epayment may be waived if the overpayment was caused as a direct result of the [State's] error, and it would be against the principles of equity and good conscience to require repayment.").

**RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**